STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. GARY ROBINSON AND DEREK VAN AUSTIN, DEFENDANTS-APPELLANTS.

Superior Court of New Jersey
Appellate Division

Submitted September 30, 1975—Decided February 27, 1976.

478

Before Judges KOLOVSKY, BISCHOFF and BOTTER.

*Mr. Stanley C. Van Ness,* Public Defender, attorney for appellants (*Mr. Daniel W. O'Mullan,* designated attorney, of counsel and on the brief for appellant Gary Robinson; and *Mr. Philip S. Elberg,* designated attorney, of counsel and on the brief for appellant Derek Van Austin).

*Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney for respondent (*Mr. David L. Rhoads,* Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

BOTTER, J. A. D. Defendants were convicted of second degree murder. The victim, Nathan "Dukie" Mitchell, was shot on a street in East Orange on February 16, 1972. With leave of the court, separate appeal briefs were filed for each defendant, and each asserts various errors in the trial judge's instructions to the jury.

The State offered evidence tending to support a case of felony murder. Alma "Dolly" Darci testified that she had given Dukie narcotics on credit; that shortly thereafter defendants approached Dukie, pushed him against a car and began going through his pockets. Dukie resisted and he was shot. She said that Gary Robinson had the gun, although there was testimony that Derek Van Austin had the gun earlier that evening.

Jimmy Johnson testified that he was with Alma Darci when he heard the shot. They were the State's principal witnesses. Johnson testified that they were walking side by side, talking, and upon hearing the shot he turned around and saw Dukie fall. Then defendants ran past them. There was evidence that Johnson and Darci were close associates who dealt in narcotics and knew defendants before this incident.

Both defendants testified. Gary Robinson said that he spent the day with Derek Van Austin; that Derek had a gun which he tried to use as security for a loan from Jimmy Johnson so that they could both buy heroin, but Johnson declined the offer. Robinson said that he took the gun from Derek intending to use it in negotiating for heroin. He also testified that earlier in the week he had "burnt" Dukie by taking $35 from him for heroin without delivering the goods. He said he did not see Dukie again until the night in question. He testified that Dukie approached him in anger, an argument ensued and he stepped back, displaying part of the gun to Dukie to scare him off. Instead, Dukie reached for the gun, the gun went off and Dukie fell. He and Derek ran to Derek's house. At that time Derek had the gun and Robinson arranged to have someone dispose of it.

Derek Van Austin testified that he was with Gary Robinson when Dukie approached in an angry manner. Robinson produced a pistol and Dukie grabbed for it. A struggle ensued, the gun went off and he ran from the scene. He said he did not join in the struggle and he denied having the

gun that night. He admitted using heroin in small quantities. Both defendants denied that it was Dukie who was supposed to deliver heroin to them. The State theorized that it was defendants who expected to receive heroin from Dukie and that they went after him to seize the heroin that he had obtained from Alma Darci.

The trial judge charged the jury on various principles of law, including murder, manslaughter, malice, aiding and abetting, misadventure, self-defense and the duty to retreat. Shortly after the jury began deliberating they asked to be reinstructed on the definition of first degree murder, second degree murder and manslaughter. Supplemental instructions were given and the jury resumed deliberations.

The next day the jury asked for additional instructions, namely, (1) the definition of aiding and abetting, (2) whether aiding and abetting can be applicable in second degree murder or manslaughter, and (3) the legal definition of malice. In response the court gave the following supplemental instructions:

* * * the law of this State with respect to aiders and abettors, is as follows:

If two or more persons act in concert in committing a criminal offense such as the one charged here, all who participate in the commission of the offense are equally guilty of this offense regardless of the part each took in the commission of the crime. Consequently, if a killing is brought about by the action of one of those involved, all who are acting in concert are guilty.

So that's the law with respect to aiding and abetting.

Now, with respect to the — you asked for the definition of malice as I gave it to you. I stated that malice in its legal sense means nothing more than an illegal state of mind. The law presumes that all unlawful homicides, that is, all unlawful killings are committed with malice unless the lack of malice appears from the evidence. That's the definition of malice.

Now, you asked the third question which is can aiding and abetting be applicable to second degree murder or manslaughter? Aiding and abetting can be applicable to any unlawful act.

Now, I think that answers the three questions, at least, I hope so.

Exception was taken to the supplemental charge on aiding and abetting, specifically to the absence of an instruction that intent to aid and abet must be present. Exceptions were also taken by both defendants to the charge on malice, complaining that it was not complete.

Both defendants contend before us that the supplemental charge on malice was erroneous. Robinson also contends that the earlier instructions placed undue emphasis on the presumption that all unlawful homicides or killings are murder in the second degree unless "rebutted upward by the State by showing * * * that the killing was first degree murder" or "rebutted downward if the evidence shows" that the offense was "no more than manslaughter." As a result, Robinson contends, the instructions implied that defendants had the burden of proving that the killing, if unlawful, was manslaughter and not murder. Our disposition of the contention regarding the supplemental charge on malice makes it unnecessary to resolve Robinson's assertion that the burden of "mitigating murder to manslaughter" was impliedly shifted to defendants.[1] Reading the charge as a whole (*State v. Freeman,* 64 *N. J.* 66, 69 (1973) ; *State v. Wilbely,* 63 *N. J.* 420, 422 (1973)), we conclude, nevertheless, that the supplemental instructions on malice were erroneous and require a reversal of defendants' convictions.

Murder (*N. J. S. A.* 2A:113–1 and *N. J. S. A.* 2A:113–2) is said to be distinguished from manslaughter

---

[1]The two contentions are related. However, Robinson's contention as to the implicit shift in the burden of proof is complicated by the absence of exceptions (thus governed by the "plain error" rule, *R.* 1:7–2, *R.* 2:10–2; *State v. Macon,* 57 *N. J.* 325, 336–341 (1971) and *State v. Hock,* 54 *N. J.* 526, 538 (1969), *cert.* den. 399 *U. S.* 930, 90 *S. Ct.* 2254, 26 *L. Ed.* 2d 797 (1970)), and by the presence of instructions which placed upon the State the burden of proving "any crime or any degree of crime" beyond a reasonable doubt. *United States ex rel. Castro v. Regan,* 525 *F.* 2d 1157 (3 Cir. 1975), upheld a similar charge against a challenge based upon *Mullaney v. Wilbur,* 421 *U. S.* 684, 95 *S. Ct.* 1881, 44 *L. Ed.* 2d 508 (1975), discussed below.

(*N. J. S. A.* 2A:113–5) by malice, express or implied. *State v. Gardner,* 51 *N. J.* 444, 457–459 (1968) ; *State v. Brown,* 22 *N. J.* 405, 410–411 (1956). Manslaughter is an offense distinct from and not a degree of murder, and malice is "the grand criterion which distinguishes murder from other killing." *Id.* at 410. At common law all homicides were presumed to be malicious unless the evidence proved otherwise, but murder could be *"justified* by the command or permission of the law," or it could be *"excused* on the account of accident or self-preservation," or it could be *"alleviated* into manslaughter * * *." *Id.* at 410–411; *State v. Gardner, supra.*

In his charge proper and in the first supplemental instructions the trial judge stated that all "unlawful homicides or killings are murder in the second degree," but the presumption of second degree murder is rebuttable upward to first degree or downward to manslaughter, according to the evidence. Defendants contend that in defining malice as "nothing more than an illegal state of mind," and in charging that all unlawful homicides or killings "are [presumed] committed with malice unless the lack of malice appears from the evidence," the judge failed to define malice properly and relieved the State of its full burden of proving malice, thus erroneously establishing a presumption in favor of murder over manslaughter.

Earlier cases did say that an "unlawful homicide" is presumed to be murder in the second degree, *State v. DiPaolo,* 34 *N. J.* 279, 294 (1961), *cert.* den. 368 *U. S.* 880, 82 *S. Ct.* 130, 7 *L. Ed.* 2d 80 (1961), and that proof of a "killing" raises a presumption of malice which may be rebutted by the evidence. *State v. Williams,* 29 *N. J.* 27, 43–44 (1959) ; *State v. Huff,* 14 *N. J.* 240, 249 (1954). However, these statements are superseded by the ruling in *State v. Gardner, supra,* which makes it clear that the presumption of second degree murder ("any other kind of *murder* is murder in the second degree." *N. J. S. A.* 2A:113–2 ; emphasis added) applies only as between first degree murder

and second degree murder; it comes into play for the bene-
fit of a defendant only after the State has proved a *murder*
beyond a reasonable doubt. The presumption of second de-
gree murder plays no role in distinguishing between murder
and manslaughter. The prosecution bears the burden of
proving malice to establish murder and must disprove facts
that would reduce the offense to manslaughter (*i.d.,* 51
*N. J.* at 459), when the issue is presented by the evidence,
just as the prosecution must disprove self-defense when that
issue appears. *State v. Abbott,* 36 *N. J.* 63, 72–73 (1961);
*State v. Terry,* 41 *N. J.* 1 (1963); see *Mullaney v. Wilbur,*
421 *U. S.* 684, 95 *S. Ct.* 1881, 44 *L. Ed.* 2d 508 (1975).
The court said in *State v. Gardner*:

Only when the essential elements of murder have been proved
beyond a reasonable doubt does the presumption of murder in the
second degree arise. This presumption is intended to favor the de-
fendant and to underscore the burden of the State to prove three
additional elements, *i. e.,* premeditation, deliberation and willfulness
as defined in *State v. DiPaolo,* 34 *N. J.* 279, 295 (1961), beyond a
reasonable doubt, in order to elevate the crime from second degree
to first degree. The presumption has no role whatever in deter-
mining whether (1) there was in fact an intent to kill or inflict
grave bodily harm (the minimum requirement of murder), or (2)
the homicide was justifiable or excusable, or (3) the homicide was
no greater than manslaughter. The State's burden of proving, be-
yond a reasonable doubt, that the homicide was murder includes
the burden of so proving that the killing was not accidental, justified
or excusable, or manslaughter. The State must bear this burden
throughout the entire trial and the presumption comes into play
only after the State has satisfied this mandate. It must, of course,
be remembered in connection with the foregoing discussion that we
are not here dealing with a felony murder. [51 *N. J.* at 459][2]

*State v. Gardner, supra,* 51 *N. J.* at 459, held that the
failure to convey proper instructions on the State's burden
of proof constituted plain error requiring reversal. However,

[2]Without proof of malice, a killing in the commission of a felony
or a killing of certain law enforcement officers who are performing
their duties is murder. *N. J. S. A.* 2A:113–1; *State v. Madden,*
61 *N. J.* 377, 384–386 (1972).

the charge in *Gardner* expressly put the burden on defendant to persuade the jury that the evidence warranted an "alleviation" to manslaughter. The charge in the case at hand did not explicitly shift the burden, but appellants contend that the effect was the same. *State v. Gardner* foreshadowed the recognition of this issue as a matter of federal constitutional import. *Mullaney v. Wilbur, supra,* recently held that Maine Law violated the due process clause of the Fourteenth Amendment by requiring a defendant charged with murder to establish by a preponderance of evidence that he acted in the heat of passion on sudden provocation in order to reduce the homicide to manslaughter. Due process requires the prosecution to prove beyond a reasonable doubt the absence of facts which make a killing manslaughter when the issue properly appears in the case.

■ ■ We are satisfied that the judge erred in defining malice in the supplemental instructions. The charge that malice means "nothing more than an illegal state of mind" was erroneous. Coupled with the statement that "[t]he law presumes that all unlawful homicides, that is, all unlawful killings are committed with malice unless the lack of malice appears from the evidence," the instruction constituted prejudicial error. To say that malice is simply an illegal state of mind blurs the use of the term in distinguishing murder from manslaughter, since both involve illegal states of mind. See *State v. Madden,* 61 *N. J.* 377, 386, 395–396 (1972). And to presume malice from any unlawful killing tends to prefer murder over manslaughter, contrary to the principles enunciated in *State v. Gardner* and *Mullaney v. Wilbur, supra.*

■ Of course, malice, being a state of mind, may be inferred from the circumstances of the killing. *Mullaney v. Wilbur, supra,* 421 *U. S.* at 692, 95 *S. Ct.* at 1885, 44 *L. Ed.* 2d at 516; *State v. Brown, supra,* 22 *N. J.* at 410. But there is a vast difference between a permissible inference and a presumption of fact. See *State v. DiRienzo,* 53 *N. J.* 360,

378–382 (1969); Perkins, "A Re-Examination of Malice Aforethought," 43 *Yale L. J.* 537, 550 (1934) (hereafter Perkins); *cf. State v. DiPaglia,* 64 *N. J.* 288, 294 (1974); *Jurman v. Samuel Braen, Inc.,* 47 *N. J.* 586, 594–597 (1966). There is no logical basis for presuming that every unlawful killing implies malice. Where the burden is on the State to prove every fact necessary to constitute the crime (*Mullaney v. Wilbur, supra; In re Winship,* 397 *U. S.* 358, 364, 90 *S. Ct.* 1068, 1071, 25 *L. Ed.* 2d 368, 375 (1970)), instructing a jury in terms of presumptions of fact rather than permissible inferences presents risks of constitutional dimension. See *State v. DiRienzo, supra;* see also *Barnes v. United States,* 412 *U. S.* 837, 93 *S. Ct.* 2357, 37 *L. Ed.* 2d 380 (1973); *Leary v. United States,* 395 *U. S.* 6, 89 *S. Ct.* 1532, 23 *L. Ed.* 2d 57 (1969); *United States v. Romano,* 382 *U. S.* 136, 86 *S. Ct.* 274, 15 *L. Ed.* 2d 210 (1965); *Tot v. United States,* 319 *U. S.* 463, 63 *S. Ct.* 1241, 87 *L. Ed.* 1519 (1943).

The problem may be clarified further by considering the definition of malice — a matter of some controversy. See *State v. Gardner, supra,* 51 *N. J.* at 458; Perkins, *supra.* Its usefulness as a word of art to convey the distinction between murder and manslaughter must be questioned. *Cf. State v. Madden, supra,* 61 *N. J.* at 396–397.

 ██ Malice has been variously defined. In some contexts it is described as merely the intentional doing of an unlawful act without justification or excuse, regardless of consciousness of wrongdoing. *Morss v. Forbes,* 24 *N. J.* 341, 358–359 (1957); see also *id.* at 379–380 (Weintraub, J., dissenting). Often used synonymously with criminal intent as knowing wrongdoing, the "concurrence of an 'evil meaning mind with an evil doing hand,'" (*State v. Fair,* 45 *N. J.* 77, 90 (1965); *State v. Williams,* 29 *N. J.* 27, 41 (1959); *Morisette v. United States,* 342 *U. S.* 246, 251, 72 *S. Ct.* 246, 249, 96 *L. Ed.* 288, 294 (1952)), the term is also given more invidious characteristics such as an "evil de-

sign in general, the dictate of a wicked, depraved and malignant heart" (*State v. Brown, supra,* 22 *N. J.* at 410), possibly even animated by anger or hatred (see *State v. Huff, supra,* 14 *N. J.* at 249). But proving a hateful motive is not essential to proof of malice, for, as noted, historically malice was presumed from the intentional commission of the wrongful act. *Id.;* Perkins, *supra* at 548–551. The real difficulty is that the meaning of malice in common understanding and usage, as well as in law, is not suitably exact for defining crimes as serious as murder and manslaughter. In fact, the term "malice aforethought" which had various particular meanings in the law of homicide (see Perkins, *supra* at 544–551) has given way to mere "malice" with all its loose connotations.

A knowing intention to do an unlawful act constitutes *mens rea,* criminal intent — an "evil intention." *State v. Labato,* 7 *N. J.* 137, 149 (1951). One can intend less than serious bodily injury and still act with an evil-meaning mind. This was illustrated in *State v. Madden, supra,* where a police officer was attacked and killed by a mob composed of persons who may have had diverse criminal, evil intents, ranging from an intent to kill, to injure, to interfere with the officer's performance of his duty or merely to harass or humiliate. 61 *N. J.* at 396. However, the court said that if death resulted from an act not performed with the intention to do some injury to the officer, the crime would be involuntary manslaughter, not murder. *Id.* at 386. Thus, unlawful acts causing death which are performed with evil intention or hatred may constitute murder or manslaughter — or possibly only a *quasi*-criminal offense.

*State v. Madden* highlights the need to deal in specifics when charging a jury. It proves the inutility of the phrases "an unlawful act," "criminal intent" or "an evil meaning mind" when defining degrees of homicide. *Id.* at 395–397. The need to deal in specifics is no less acute because the term malice has an ancient history as the sign of murder.

 Thus, when distinguishing murder from manslaughter it is desirable to define murder as a killing committed (a) with the intent to kill or to do grievous bodily harm to any person or (b) with knowledge of the likelihood of death or grievous bodily injury accompanied by an indifference to the result. *State v. Gardner, supra,* 51 *N. J.* at 458; *State v. Madden, supra,* 61 *N. J.* at 385. Involuntary manslaughter is distinguished by an intent to inflict less than serious injury, *id.;* and it includes an unintentional killing such as results from the reckless handling of a firearm. See *State v. Bonano,* 59 *N. J.* 515, 523 (1971). Voluntary manslaughter is a killing committed in a sudden transport of passion induced by provocation sufficient to inflame an ordinary, reasonable person. *State v. Madden, supra,* 61 *N. J.* at 399–400; *State v. Guido,* 40 *N. J.* 191, 209 (1963); *State v. King,* 37 *N. J.* 285, 299–301 (1962). These definitions are not complete, but they illustrate a proper focus upon essential elements of the crimes without the distortion engendered by concepts of evil.[3] To say that malice can be inferred from circumstances which prove an intention corresponding to the conditions of murder is tautological at the very least. Nothing is lost by omitting the term "malice" in instructing a jury,[4] and *State v. Gardner* and *State v. Madden* strongly suggest the need to emphasize specific acts and intents in differentiating murder from manslaughter.

---

[3]This abbreviated description of acts constituting murder omits the crimes of felony murder and murder of law enforcement officers. See note 2, *supra.* Defining the crimes in this fashion shows how little, if anything, is lost by omitting the term "malice."

[4]In defining murder, manslaughter and negligent homicide, the term malice is not used in the *Model Penal Code (U. L. A.)* § 210.0 to 210.4, at 532–533, approved by the American Law Institute in 1962. This treatment is followed in the proposed New Jersey Penal Code,[1] *Final Report of the New Jersey Criminal Law Revision Commission,* §§ 2C:11–1 to 2C:11–5, at 49–51 (1971).

As we have said, the brief definition of malice in response to the jury's inquiry was inaccurate and misleading. We cannot say that the error was made harmless by earlier instructions which properly defined manslaughter and the State's burden of proof. Since we must reverse on this point no purpose would be served by reviewing in detail the supplemental charge on aiding and abetting or considering its potential for prejudice. The instruction was obviously incomplete. It did not embrace the statutory definition — to aid, abet, counsel, command, induce or procure, *N. J. S. A.* 2A:85–14 — although the phrase "act in concert" did suggest community of purpose. See *State v. Sullivan,* 43 *N. J.* 209, 236–237 (1964), *cert.* den. 382 *U. S.* 990, 86 *S. Ct.* 564, 15 *L. Ed.* 2d 477 (1966). But the possibility that separate participation and intent will establish different kinds or degrees of crime, or none at all, committed by each defendant (*State v. Fair, supra,* 45 *N. J.* at 94–96) made it essential to discuss intent as part of the aiding and abetting charge. As stated in *State v. Madden, supra*:

* * * if two should attack and one of them intends only a simple assault and battery and is unaware of the intent of the other to use deadly force, he would be culpable only according to his own intent and wrong. But if he participates in an attack or continues in it with an awareness of the purpose of others to kill or to do grievous bodily harm, he is chargeable with that further intent and result. [61 *N. J.* at 391]

We need not deal with the plain error contention concerning the omission to charge the effect of mere presence at the scene. See *State v. Madden, supra,* 61 *N. J.* at 397–398; *State v. Fair, supra,* 45 *N. J.* at 95.

The convictions of defendants are reversed. The case is remanded for a new trial.